UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                          :
ANDREW E. ROTH,                                           :
                                                          :
                              Plaintiff,                  :
                                                          :                    23 Civ. 9265 (JPC)
               -v-                                        :
                                                          :                    OPINION AND ORDER
LAL FAMILY CORPORATION and LAL FAMILY                     :
PARTNERS L.P.,                                            :
                                                          :
                              Defendants,                 :
                                                          :
and                                                       :
                                                          :
THE ESTÉE LAUDER COMPANIES INC.,                          :
                                                          :
                              Nominal Defendant.          :
                                                          :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       Through this derivative action brought on behalf of The Estée Lauder Companies Inc.

("Estée Lauder"), shareholder Andrew E. Roth pursues disgorgement of approximately $57

million in short-swing trading profits allegedly realized by two entities affiliated with the Leonard

A. Lauder family.  Roth seeks to proceed against those entities—LAL Family Corporation

("LALFC") and LAL Family Partners L.P. ("LALFP")—under Section 16(b) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78p(b), which allows publicly traded

companies (or their shareholders) to claw back profits realized by statutory insiders who purchase

and sell the company's stock within a given six-month period.  LALFP and LALFC, joined by

Estée Lauder, move to dismiss Roth's Complaint for failure to state a claim for relief.  For the

reasons discussed below, the Court grants the motion to dismiss.

# I.  Background

## A.    Facts[1]

Founded over seventy-five years ago by Estée and Joseph Lauder, Estée Lauder regards itself as "one of the world's leading manufacturers, marketers and sellers of quality skin care, makeup, fragrance and hair care products."  The Estée Lauder Companies Inc., Annual Report (Form 10-K), at 2 (Aug. 18, 2023), available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1001250/000100125023000112/el-20230630.htm (last visited Sept. 10, 2024).  As a publicly traded issuer under the Exchange Act, the company maintains two classes of equity.  Compl. ¶ 14.  "Each share of Class A Common Stock entitles the holder to one vote on each matter submitted to a vote of the Company's stockholders, and each share of Class B Common Stock entitles the holder to ten votes on each matter submitted to a vote of the Company's stockholders."  *Id.*; *see also id.* (explaining that "[e]ach share of Class B Common Stock is convertible into one share of Class A Common Stock").  Roth holds Estée Lauder's Class A Common Stock, *id.* ¶ 1, though the extent of his investment is not alleged.

The Lauder family, through LALFP and LALFC,[2] also holds an interest in Estée Lauder's common stock.  According to a proxy statement that Estée Lauder filed with the SEC in September 2021, LALFP and LALFC beneficially owned 82,437,628 shares of the company's Class B

---

[1] The following facts, which are assumed true solely for purposes of this Opinion and Order, are taken from Roth's Complaint, Dkt. 1 ("Compl.").  *See Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (explaining that on a motion to dismiss pursuant to Rule 12(b)(6), the court must "assum[e] all facts alleged within the four corners of the complaint to be true, and draw[] all reasonable inferences in plaintiffs' favor").  In addition, the Court takes judicial notice of the filings with the Securities and Exchange Commission ("SEC") that are incorporated by reference in the Complaint and attached to the declarations submitted by the parties.  *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Donoghue v. Gad*, No. 21 Civ. 7182 (KPF), 2022 WL 3156181, at *4-5 (S.D.N.Y. Aug. 8, 2022).

[2] LALFC is the sole general partner of LALFP, which owns Estée Lauder common stock.  Compl. ¶¶ 3-6.

Common Stock, which represented "54.4% of the combined voting power of the outstanding Class A Common Stock and Class B Common Stock as of July 31, 2021." *Id.* ¶ 12. And as reported in Estée Lauder's September 2022 proxy statement, LALFP and LALFC beneficially owned 80,437,628 shares of Class B Common Stock as of July 21, 2022, giving the two entities 54.1% of the combined voting power. *Id.* As a result, LALFP and LALFC remained Estée Lauder's controlling shareholders between May 2021 and May 2022. *Id.* Indeed, Estée Lauder "has regularly disclosed that the Lauder family controls the Company" in its quarterly and annual reports filed with the SEC. *Id.* ¶ 15; *see, e.g.*, The Estée Lauder Companies Inc., Annual Report (Form 10-K), at 24 (Aug. 24, 2022), available at, https://www.sec.gov/ix?doc=/Archives/edgar/data/1001250/000100125022000122/el-20220630.htm (last visited Sept. 10, 2024) ("We are controlled by the Lauder family. As a result, the Lauder family has the ability to prevent or cause a change in control or approve, prevent or influence certain actions by us.").

On November 18, 2021, LALFP and LALFC disclosed that they had sold two million shares of Estée Lauder's Class A Common Stock at a share price of $342.23 on November 17, 2021. Compl. ¶ 20. Through various filings with the SEC, Estée Lauder reported the following repurchases of its shares on the open market that occurred within six months of LALFP and LALFC's November 17, 2021 sale:

| Repurchase Date | Quantity of Shares | Average Share Price |
|---|---|---|
| May 2021 | 529,363 | $298.18 |
| June 2021 | 532,633 | $303.55 |
| July 2021 | 436,600 | $321.27 |
| August 2021 | 353,202 | $328.44 |
| September 2021 | 800,000 | $330.71 |

| October 2021 | 843,000 | $314.99 |
| November 2021 | 650,462 | $338.56 |
| January 2022 | 838,246 | $325.44 |
| February 2022 | 365,988 | $303.78 |
| March 2022 | 673,161 | $273.06 |
| April 2022 | 616,083 | $266.80 |
| May 2022 | 338,189 | $244.73 |

*Id.* ¶ 21.  According to Roth, by virtue of their percentage ownership of Estée Lauder's Class A and Class B Common Stock as reported in the company's 2021 and 2022 proxy disclosures, LALFP and LALFC "had an approximate 23% indirect pecuniary interest" in the share repurchases listed above.  *Id.* ¶ 22.  Thus, in Roth's view, "each of LALFP and LALFC realized short-swing profits of at least $56.7 million" when their November 17, 2021 sale is matched against Estée Lauder's repurchases on the open market between May 2021 and May 2022.  *Id.* ¶ 24.

**B.    Procedural History**

On April 20, 2023, Roth served a demand letter on Estée Lauder referencing the transactions described above and asking the company to recover, pursuant to Section 16(b) of the Exchange Act, the trading profits that LALFP and LALFC allegedly realized.  *Id.* ¶ 29.  But as conveyed in a letter sent to Roth eight weeks later, Estée Lauder declined to seek recovery from LALFP or LALFC.  *Id.*

On October 20, 2023, not long after Estée Lauder refused his demand, Roth filed the present action against LALFP and LALFC and named the company as a nominal defendant. Dkt. 1.  Proceeding on the theory that an issuer's open-market share repurchases can be matched to its controlling shareholder's sales for purposes of Section 16(b), Roth alleges that, as Estée

4

Lauder's controlling shareholders, LALFP and LALFC engaged in "short-swing transactions" in Estée Lauder's common stock as determined by matching their November 17, 2021 sale against Estée Lauder's May 2021 through May 2022 repurchases.  Compl. ¶¶ 23-24.  Based on those transactions, Roth alleges that LALFP and LALFC realized at least $56.7 million in disgorgeable profits.  *Id.* ¶ 24, Exh. A (providing a "Computation of LALFP/LALFC's Short-Swing Trading in [Estée Lauder] Common Stock").  Accordingly, Roth seeks recovery of at least $56.7 million in monetary damages from LALFP and LALFC.  *Id.* ¶ 28.

Just three days before Roth filed the instant Complaint, the Honorable John Antoon II of the United States District Court for the Middle District of Florida rejected a lawsuit filed by Roth premised on a virtually identical legal theory.  In that case, Roth sought disgorgement from a controlling shareholder of Luminar Technologies, Inc. pursuant to Section 16(b).  *See Roth v. Russell*, No. 6:23-CV-722-JA-RMN, 2023 WL 6845502, at *3 (M.D. Fla. Oct. 17, 2023).  Judge Antoon held in *Russell* that an issuer's open-market share repurchases cannot be attributed to its statutory insiders to establish short-swing liability under Section 16(b).  *See id.* at *5.[3]

On January 16, 2024, LALFP and LALFC moved to dismiss Roth's Complaint for failure to state a claim for relief pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkts. 19, 20 ("Motion").  The two entities argue that, as an issuer, Estée Lauder's 2021 and 2022 open-market share repurchases cannot be considered "purchases" for purposes of imposing Section 16(b) liability on the company's insiders.  Motion at 10-17.  They also contend that Roth failed to adequately plead that LALFP and LALFC beneficially owned the shares that Estée Lauder

---

[3] Roth has brought at least two other actions under Section 16(b) pursuing this same theory of liability.  *Roth v. CK Amarillo LP*, No. 24 Civ. 706 (LTS) (S.D.N.Y. Jan. 31, 2024), Dkt. 1; *Roth v. Drahi*, No. 23 Civ. 5522 (DLI) (E.D.N.Y. July 20, 2023), Dkt. 1.  In each, a motion to dismiss is pending as of the date of this Opinion and Order.  *CK Amarillo*, No. 24 Civ. 706, Dkt. 18; *Drahi*, No. 23 Civ. 5522, Dkt. 16.

repurchased, *id.* at 17, that Roth failed to allege that the two entities realized a cognizable profit in the company's stock, *id.* at 17-23, and further that Estée Lauder's repurchases of shares fell outside the core purposes of Section 16(b) because they did not create an opportunity for speculative abuse on the part of the company's insiders, *id.* at 23-24. Estée Lauder also has moved to dismiss the Complaint, Dkt. 23, joining LALFP and LALFC's motion and explaining that, in response to Roth's demand letter, the company "concluded that the identified trades are not actionable under Section 16(b) and there is no recoverable short-swing profit," Dkt. 24 at 2.

Roth opposed LALFP and LALFC's motion on February 16, 2024. Dkt. 26 ("Opposition"). Three weeks later, LALFP and LALFC filed their reply brief. Dkt. 29 ("Reply"). Estée Lauder also joined LALFP and LALFC's reply. Dkt. 30.[4]

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* These "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

---

[4] Roth requested oral argument on Defendants' motion to dismiss. Dkt. 28. Because the Court does not deem oral argument necessary to resolve the motion, that request is denied.

## III.  Discussion

### A.    Statutory and Regulatory Framework[5]

Roth's claim for disgorgement against LALFP and LALFC arises under Section 16(b) of the Exchange Act.  In relevant part, Section 16(b) provides:

> For the purpose of preventing the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months, . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction . . . .

15 U.S.C. § 78p(b).

Congress enacted Section 16(b) as a prophylactic measure to "deter insiders from taking unfair advantage of confidential company information to realize short-swing profits on trades in the company's stock."  *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 122 (2d Cir. 2001); *see also Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998) ("Section 16(b) of the Exchange Act seeks to deter 'insiders,' who are presumed to possess material information about the issuer, from using such information as a basis for purchasing or selling the issuer's equity securities at an advantage over persons with whom they trade."  (citing 15 U.S.C. § 78p) (footnote omitted)).  And, as a strict-liability statute, Section 16(b) requires "[n]o showing of actual misuse of inside information or of unlawful intent . . . to compel disgorgement."  *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998); *see also Gollust v. Mendell*, 501 U.S. 115, 122

---

[5] The parties completed their briefing before the Supreme Court issued its decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).  While the parties each refer to various pre-*Loper Bright* cases in supporting their positions, no party has suggested that any of the SEC's regulations or interpretations that could potentially affect the application of Section 16 are invalid. This case accordingly presents no occasion to consider that matter, and the Court expresses no views thereon.

(1991) ("The statute imposes a form of strict liability on [insiders], rendering them liable to suits requiring them to disgorge their profits even if they did not trade on inside information or intend to profit on the basis of such information.").  But even so, Section 16(b) only applies to "pairs" of securities transactions—"transactions of securities that cannot be 'paired' are not within the scope of § 16(b)."  *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013); *see also At Home Corp. v. Cox Commc'ns, Inc.*, 446 F.3d 403, 405 (2d Cir. 2006) (requiring a "matching sale and purchase" of a security.

Thus, "[t]o state a claim for relief under Section 16(b), a plaintiff must plead four elements: '(1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period.'"  *Mercer v. Gupta*, 880 F. Supp. 2d 486, 489 (S.D.N.Y. 2012) (quoting *Gwozdzinsky*, 156 F.3d at 308).  And where, as here, the company is unwilling to seek recovery itself, Section 16(b) authorizes shareholders to bring suit on a derivative basis.  15 U.S.C. § 78p(b) (allowing "the owner of any security of the issuer" to file an action "in the name and in behalf of the issuer"); *Donoghue v. Bulldog Invs. Gen. P'ship*, 696 F.3d 170, 175-76 (2d Cir. 2012) (recognizing the derivative nature of Section 16(b) claims brought by shareholders).

Section 16(b) is closely "interrelated with the congressionally created reporting requirements of § 16(a)."  *Rosen ex rel. Egghead.Com, Inc. v. Brookhaven Cap. Mgmt., Co.*, 179 F. Supp. 2d 330, 335 (S.D.N.Y. 2002) (quoting *Whittaker v. Whittaker Corp.*, 639 F.2d 516, 530 (9th Cir. 1981)).  Section 16(a) imposes various reporting obligations on statutory insiders, generally requiring them to disclose, within two business days, any changes to their beneficial ownership of the company's securities, such as purchases or sales thereof.  15 U.S.C. § 78p(a)(2)(C), (a)(3)(B).  By regulation, such disclosures of changes in beneficial ownership must be made on Form 4, which

is filed publicly with the SEC.  17 C.F.R. § 240.16a-3(a) ("Statements of changes in beneficial ownership required by [Section 16(a)] shall be filed on Form 4.").  In particular, insiders must report "[a]ll transactions not exempt from section 16(b)" through Form 4 filings with the SEC.  *Id.* § 240.16a-3(g)(1).  Section 16(a), in other words, "provides a mechanism for facilitating the recovery of short-swing profits [under Section 16(b)] by requiring statutory insiders to disclose any change in ownership" on Form 4.  *Tristar Corp. v. Freitas*, 84 F.3d 550, 553 (2d Cir. 1996).  This allows issuers and shareholders to "use the Form 4s to establish liability in an action under section 16(b)."  *Id.*  And conversely, "any transaction that does not fall within the reporting requirements of § 16(a)" is also "exclude[d] from liability" under Section 16(b).  *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 426 (1972) (citing 17 C.F.R. § 240.16a-10); *see also Strom v. United States*, 641 F.3d 1051, 1062 (9th Cir. 2011) (explaining that "any event that triggers liability under § 16(b) must first be a reportable event under § 16(a)").

Under this statutory framework, then, the term "beneficial owner" is relevant twice over: it determines both *who* is subject to Sections 16(a) and 16(b) and *which transactions* are subject to reporting and potential liability under those provisions, respectively.  *See Feder v. Frost*, 220 F.3d 29, 33 (2d Cir. 2000); *Whiting v. Dow Chem. Co.*, 386 F. Supp. 1130, 1133-34 (S.D.N.Y. 1974).  Yet the statute itself does not define the term "beneficial owner," despite its centrality to Section 16(b)'s operation.  *See Avalon Holdings Corp. v. Gentile*, 597 F. Supp. 3d 640, 654 (S.D.N.Y. 2022).  The SEC, instead, has promulgated regulations defining that term for purposes of determining who is subject to Section 16 at all, as well as for determining which transactions are subject to reporting and disgorgement of short-swing profits.

Those regulations effectively create a two-step analysis for determining whether a given transaction must be reported under Section 16(a) and falls within the scope of Section 16(b).  At

step one, Rule 16a-1(a)(1) defines the term "beneficial owner"—when used to determine who is subject to Section 16 as a "beneficial owner of more than 10 percent" of an issuer's stock, 15 U.S.C. § 78p(a)(1)—as "any person who is deemed a beneficial owner pursuant to section 13(d) of the [Exchange] Act." 17 C.F.R. § 240.16a-1(a)(1).[6]  Then, Rule 16a-1(a)(2) provides that for purposes of assessing which transactions must be reported under Section 16(a) and are potentially subject to liability under Section 16(b), "the term beneficial owner shall mean any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities." *Id.* § 240.16a-1(a)(2). And, in turn, "[t]he term pecuniary interest in any class of equity securities shall mean the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." *Id.* § 240.16a-1(a)(2)(i).  Rule 16a-1 also enumerates various forms of "indirect pecuniary interest[s]," including "[s]ecurities held by members of a person's immediate family sharing the same household," *id.* § 240.16a-1(a)(2)(ii)(A), "[a] general partner's proportionate interest in the portfolio securities held by a general or limited partnership," *id.* § 240.16a-1(a)(2)(ii)(B), and "[a] person's interest in securities held by a trust," *id.* § 240.16a-1(a)(2)(ii)(E).  In sum, if a person satisfies the definition of "beneficial owner" under

---

[6] Section 13(d) imposes a reporting obligation on persons who beneficially acquire more than five percent of an issuer's stock. *See* 15 U.S.C. § 78m(d).  For purposes of that provision, Rule 13d-3(a) defines the term "beneficial owner" as including:

> [A]ny person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
>
> > (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or,
> >
> > (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3(a).

Rule 16a-1(a)(1), then at step two "the pecuniary interest definition of beneficial owner [under Rule 16a-1(a)(2)] determines what securities holdings and transactions must be reported [under Section 16(a)] and which transactions are subject to short-swing profit liability [under Section 16(b)]." *Ownership Reports and Trading by Officers, Directors and Principal Security Holders*, 54 Fed. Reg. 35667, 35670-71 (proposed Aug. 29, 1989).

## B.    The Motion to Dismiss

The parties do not dispute that Roth has plausibly alleged that LALFP and LALFC are generally subject to Sections 16(a) and 16(b) as beneficial owners of more than ten percent of Estée Lauder's Class A Common Stock. *See* 15 U.S.C. § 78p(a)(1); Compl. ¶ 5 ("At all relevant times, LALFP had direct beneficial ownership, and as the sole general partner of LALFP, LALFC had indirect beneficial ownership, of greater than 10% of [Estée Lauder's] outstanding Class A Common Stock . . . ."). Instead, LALFP and LALFC principally argue that under the plain meaning of Section 16(b), the shares that Estée Lauder, the statutory issuer, repurchased on the open market between May 2021 and May 2022 cannot be matched to their own November 17, 2021 sale for purposes of creating Section 16(b) insider-trading liability. *See* Motion at 10-11. Roth responds that under Rule 16a-1(a)(2), LALFP and LALFC had at least an indirect pecuniary interest in Estée Lauder's repurchases because by decreasing the total number of outstanding shares, those repurchases had the effect of increasing the value of LALFP and LALFC's (and all other remaining investors') holdings in the company. *See* Opposition at 10-15. Under Roth's theory, LALFP and LALFC were therefore beneficial owners of the repurchased shares, which can be matched against their November 17, 2021 sale for purposes of establishing short-swing profits subject to disgorgement under Section 16(b). *See id.* Accordingly, the question presented in this

case is whether an issuer's open-market share repurchases can be considered "purchases" by its controlling shareholder for purposes of Section 16(b).

### 1. The Plain Meaning and Structure of Section 16(b) Exclude Issuer Share Repurchases.

Because LALFP and LALFC's motion presents an issue of statutory interpretation, the Court "begin[s] by examining the statutory text." *Gibbons*, 703 F.3d at 599 (citing *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 407 (2011)). In describing the transactions subject to potential liability, Section 16(b) refers in the passive voice to "any profit realized by [an insider] from any purchase and sale, or any sale and purchase," without specifying *who* must conduct the purchases and sales. 15 U.S.C. § 78p(b). Nevertheless, the Second Circuit has described the statute as requiring the plaintiff to allege a "purchase . . . by an insider." *Chechele v. Sperling*, 758 F.3d 463, 467 (2d Cir. 2014) (alteration adopted); *Gwozdzinsky*, 156 F.3d at 308 (similar). Apart from clarifying that a "purchase," as used throughout the Exchange Act, includes "any contract to buy, purchase, or otherwise acquire," 15 U.S.C. § 78c(a)(13), the statute does not specifically define the term. Contemporary dictionaries from the time of the passage of the Exchange Act, however, defined "purchase" as "to obtain (anything) by paying money or its equivalent." *Webster's Second New International Dictionary* (1934); *The Oxford English Dictionary* (1933) (defining "purchase" as "[t]o procure for oneself, acquire, obtain, get possession of" and "[t]o acquire by the payment of money or its equivalent"); *see also Ballentine's Law Dictionary* (1930) (defining "purchase" as "[a]ny means of acquiring property other than by descent"). These definitions indicate that the ordinary meaning of "purchase" at the time of the Exchange Act's passage entailed that the purchaser "acquire" or "obtain" the subject of the transaction, or, if not actual possession, at least some cognizable or contemplated interest in the subject of the transaction. *See Avalon Holdings*, 597 F. Supp. 3d at 652 (holding that a "purchase"

under Section 16(b) depends on whether the purchaser "incurs irrevocable liability" for the transaction, as opposed to whether they acquire "actual possession" of the securities); 15 U.S.C. § 78c(a)(13) (specifying that a "purchase" can be a "contract to . . . purchase").  Reading the term "purchase" to require that the purchaser obtain some kind of interest in the property being transacted for is consistent with the Exchange Act's limited definition of purchase, which refers to "any contract to buy, purchase, or *otherwise acquire*."  15 U.S.C. § 78c(a)(13) (emphasis added).  That view of the definition also tracks common sense: absent fraud, mistake, misdelivery, or similar hiccups in the buying process, it would be odd to characterize a transaction as a "purchase" by someone who got nothing in return.

Under this interpretation, an issuer's open-market share repurchases cannot be considered purchases by its insiders.  When an issuer repurchases its own shares on the open market, "such shares become 'treasury shares' until they are cancelled" or resold.  Richard A. Booth, *Financing the Corporation* § 6:15 (2022); *see also Edelman v. Phillips Petroleum Co.*, 1986 Del. Ch. LEXIS 406, at *10 (Del. Ch. June 3, 1986) ("[U]nder settled Delaware law,[7] the acquisition by a corporation of its own common stock *ipso facto* renders such shares treasury shares.").  And unlike the shares of other companies that a corporation might purchase for its investment portfolio, treasury shares "go into something like a state of 'suspended animation' in that the corporation, although nominally the owner, cannot exercise certain rights of ownership, such as the right to vote or to receive dividends."  11 Fletcher Cyc. Corp. § 5080.80 (2023).  Thus, unlike portfolio shares, "[s]hares that are reacquired have no value to the corporation for balance sheet purposes.  The only value of such shares inheres in the possibility that they might be sold again."  Booth,

---

[7] As alleged in the Complaint, "Estée Lauder . . . is a Delaware corporation with its principal place of business at 767 Fifth Avenue, New York, NY 10153."  Compl. ¶ 2.

*supra* § 6:15; *cf. also Strong v. Comm'r Internal Revenue*, No. 12504-05S, 2007 WL 895131, at

*3 (T.C. Mar. 26, 2007) ("Treasury stock has no value because it carries no voting rights, rights to

dividends, or rights to distributions.  Treasury shares are actually a legal fiction and a figure of

speech only used to explain the rights and rules that apply upon their reissue." (applying New York

law) (citation omitted)).  That merely potential value, however, "is also true of authorized but

unissued stock," Booth, *supra* § 6:15, and even Roth does not go as far as to suggest that a

corporation's shareholders have a cognizable interest in its unissued shares for Section 16(b)

purposes.  So although the corporation *itself* "purchases" its shares insofar as it acquires at least

nominal ownership of the repurchased shares and (similar to unissued shares) the right to resell

them, its remaining shareholders derive only an incidental economic benefit from the corporation's

act of repurchasing the shares.  And this benefit is not the result of the shareholders having acquired

or obtained an interest in the shares (which are effectively valueless) or the corporation's

transaction in them as such, but is instead a collateral effect of the repurchase having decreased

the total amount of shares outstanding.[8]  In that regard, an issuer's open-market repurchases differ

from the type of transaction at issue in *Feder*, where the Second Circuit held that portfolio trades

in a corporation's stock conducted by *other* companies could be attributed to one of the

corporation's insiders by virtue of the increase to the value of the insider's equity interest in those

other companies derived from the transactions.  220 F.3d at 34-35.  Thus under the plain meaning

of "purchase," which requires the acquisition of an interest (or contemplated interest) in the

---

[8] Holding that an open-market share repurchase is not a purchase by an insider-shareholder is consistent with SEC Rule 16a-4(c), which prior to 1991 provided that "[s]ecurities reacquired by or for the account of an issuer and held by it for its account shall be exempt from sections 16(a) and 16(b) during the time they are held by the issuer."  17 C.F.R. § 240.16a-4(c) (1990).  As discussed at *infra* III.B.2, Rule 16a-4(c) was repealed only because the SEC viewed it as redundant in light of Section 16(b)'s plain language.

property being transacted for, an issuer's stock repurchases cannot be considered purchases by an insider-stockholder on account of the incidental increase in the value of the insider's holdings that the repurchase may cause.

The structure of Section 16(b) confirms that an issuer's open-market share repurchases cannot be treated as purchases by its insiders, even if those insiders are controlling shareholders. *See Home Depot U.S.A. Inc. v. Jackson*, 587 U.S. 435, 441 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))). The statute, for instance, uses different language to refer to insiders than it does to refer to the company to which they belong. *See* 15 U.S.C. § 78p(b) ("For purposes of preventing the unfair use of information which may have been obtained by such *beneficial owner, director, or officer* by reason of *his relationship to the issuer*, the profit realized *by him* from any purchase and sale, or any sale and purchase, of any equity security of *such issuer* . . . within any period of less than six months . . . shall inure to and be recoverable by *the issuer*, irrespective of any intention on the part of *such beneficial owner, director, or officer* in entering into such transaction . . . ." (emphases added)). The statute assigns the two groups distinct roles within the statutory framework. An "insider" is any "beneficial owner [of more than ten percent of the issuer's shares], director, or officer," and the statute makes them potentially liable for profits realized from their trades in their company's stock. *Id.* The company that the insider belongs to, on the other hand, is referred to in Section 16(b) as the "issuer," and its statutory prerogative is to challenge short-swing trading conducted by its insiders by bringing suit against the insider for profits earned on such transactions. *Id.* Thus, by its terms, the statute seeks to "prevent[] the unfair use of information which may have been obtained by such [insider] by reason of his *relationship to the*

*issuer.*  *Id.* (emphasis added).  But in the open-market repurchase context, Roth's theory would distort these delineated statutory roles.  *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 456 (2012) ("We generally seek to respect Congress' decision to use different terms to describe different categories of people or things.").  Under his theory, the *issuer* becomes the one that conducts the necessary purchase in the pair of short-swing transactions, and the economic benefits of that purchase are also enjoyed by non-selling shareholders on a pro-rata basis, rather than just by the insider.  Given the statutory text and the harm Section 16(b) endeavors to address, it would make no sense to treat the issuer and the insider as functionally identical for purposes of identifying matching pairs of purchases and sales, and thereby to characterize the issuer's share repurchase as the insider having unfairly traded on nonpublic information that it acquired by virtue of its relationship to itself.  *See Russell*, 2023 WL 6845502, at *4.

Along similar lines, the private right of action created by Section 16(b) provides that any profits realized from insiders' short-swing trading "shall insure to and be recoverable by the issuer," 15 U.S.C. § 78p(b), and by extension its shareholders.  The statute therefore operates to allow issuers (and their shareholders) to recover ill-gotten profits realized by insiders from short-swing trading.  But that disgorgement remedy is an uncomfortable fit in the open-market repurchase context, where the issuer itself conducts one of the necessary transactions that can give rise to liability, and where its shareholders may have already benefitted to some extent from that transaction by virtue of the increase in value of their holdings.  Roth's proposed reading of the statute therefore leads to the awkward result of allowing an issuer to pursue disgorgement for profits that insiders realize as a proximate result of the issuer's own conduct.

Finally, Congress provided in the statute that disgorgement is available "irrespective of any intention on the part of [the insider] in entering into such transaction."  *Id.*  In the ordinary case of

insider trading, the function of this language is straightforward: its inclusion renders the insider strictly liable for any short-swing profits realized, without the need to examine the intent of any individual or entity involved in those transactions. *See Lowinger v. Morgan Stanley & Co.*, 841 F.3d 122, 129 (2d Cir. 2016) (observing that "Section 16(b) operates regardless of intent"). But where, as here, one of the two necessary transactions was executed by the issuer and not the insider, Section 16(b)'s strict-liability language would only partially accomplish this purpose; that is, that language would not reflect what, if any, role the *issuer*'s intent in executing the repurchase would play in assessing liability. That the statute does not account for the issuer's intent, or lack thereof, further suggests that transactions by issuers were beyond Congress's contemplation in enacting the provision and implies that, instead, the focus was solely on transactions executed by insiders.

Construing Section 16(b) as excluding open-market share repurchases conducted by the issuer accords with the general approach of the Second Circuit and the Supreme Court to interpreting the statute. Given Section 16(b)'s strict-liability nature, this Circuit has described the statute as "strong medicine for the ill Congress sought to address." *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 125 (2d Cir. 2018); *see also Magma Power*, 136 F.3d at 321 (describing Section 16(b) as a "blunt instrument" for controlling insider trading). Courts also have recognized the statute's potentially arbitrary application: "Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition." *Magma Power*, 136 F.3d at 320-21; *see also Gibbons*, 703 F.3d at 603 (observing that "Congress intended for § 16(b) to be 'a relatively arbitrary rule capable of easy administration'" (quoting *Reliance Elec.*, 404 U.S. at 422)). This has led the Supreme Court to make clear that "[i]t is inappropriate to reach the harsh result of imposing § 16(b)'s liability without fault on the basis of unclear language." *Foremost-McKesson, Inc. v. Provident Sec. Co.*,

423 U.S. 232, 252 (1976). Courts, in other words, "must assume" that "[i]f Congress wishes to impose such liability, . . . it will do so expressly or by unmistakable inference." *Id.*; *see also C.R.A. Realty Corp. v. Tri-South Invs.*, 738 F.2d 73, 76 (2d Cir. 1984) ("Since the liability imposed is strict and the remedy harsh, . . . courts have been chary of holding transactions within § 16(b) unless Congress's intent to make the section applicable was clear."). Thus, the statute must be applied "narrowly," *Packer v. Raging Cap. Mgmt., LLC*, 981 F.3d 148, 154 (2d Cir. 2020) (quoting *Foremost-McKesson*, 423 U.S. at 251), and carefully confined to its "limited areas of clear and unambiguous liability," *Lewis v. Varnes*, 505 F.2d 785, 788 (2d Cir. 1974). *See also Donoghue v. Patterson Cos., Inc.*, 990 F. Supp. 2d 421, 424 (S.D.N.Y. 2013) (explaining that transactions "that do not fall squarely into [the statute's] framework are to be construed narrowly to favor the insider because of the strict-liability nature of Section 16(b)"). As discussed above, the text of Section 16(b) does not support—let alone "expressly" or "unmistakabl[y]" demonstrate—that a corporation's open-market share repurchases can be considered purchases by its insiders. Because Section 16(b) "does not clearly have the meaning that [Roth] attributes to it," the Court declines to adopt his construction. *C.R.A. Realty*, 738 F.2d at 77; *cf. also Gibbons*, 703 F.3d at 603 (declining to recognize a novel theory of liability under Section 16(b) despite "the plausibility of [the plaintiff's] interpretation").[9]

---

[9] Indeed, commentators have recognized that the statute does *not* reach open-market share repurchases. *See, e.g.*, 18 Donald C. Langevoort, *Insider Trading Regulation, Enforcement and Prevention* § 10:3 n.1 (2024) (agreeing that "the issuer's transactions should not per se be attributed to all its insiders for purpose of liability under 16(b)"); Jesse M. Fried, *Insider Trading Via the Corporation*, 162 U. Pa. L. Rev. 801, 830 (2014) ("Section 16(b) does not apply to indirect purchases made by insiders through share repurchases or indirect sales made by insiders through equity issuances. Thus, a trade that would trigger Section 16(b) liability if done directly may be done indirectly without triggering such liability."); Jesse M. Fried, *Informed Trading and False Signaling with Open Market Repurchases*, 93 Cal. L. Rev. 1323, 1347 (2005) ("Section 16(b) does not apply to indirect purchases through stock buybacks."); *see also* Robert J. Jackson, Jr., Comm'r,

2.    **Treating an Issuer's Share Repurchases as Purchases by Its Insiders Is Inconsistent with the SEC's Regulatory Framework and Practices.**

In arguing that LALFP and LALFC were beneficial owners of the repurchased shares, Roth relies on SEC Rule 16a-1(a)(2)'s definition of "pecuniary interest," which refers to "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities."  17 C.F.R. § 240.16a-1(a)(2)(i).  Roth argues that under the Second Circuit's decision in *Feder* and the SEC's *amicus* brief filed in that case, LALFP and LALFC had at least an indirect pecuniary interest in the repurchased shares as a result of the *pro rata* increase in the value of their remaining holdings that resulted from the repurchases.  *See, e.g.*, Opposition at 18-19.  Thus, Roth maintains that his theory is consistent with the SEC's existing regulatory framework and practices.  The Court disagrees.

Rule 16a-1(a)(2) refers to "a direct or indirect pecuniary interest *in* the equity securities." 17 C.F.R. § 240.16a-1(a)(2) (emphasis added).  But here, the only economic benefit that LALFP and LALFC are claimed to have enjoyed from the repurchased shares is an increase in the value of their remaining holdings (a benefit shared with all non-selling shareholders *pro rata*) as an incident of the decreased number of outstanding shares, not an interest in the securities or Estée Lauder's transactions therein as such.  Indeed, it would virtually be a contradiction in terms to characterize a corporation's shareholders as having a pecuniary interest in valueless treasury shares.  Moreover, the non-exhaustive list of indirect pecuniary interests enumerated in Rule 16a-1(a)(2) consists of interests that are far more direct than the kind of interest Roth is relying on, and importantly none of the examples involve imputing a pecuniary interest to an insider based on

_____

Sec. & Exch. Comm'n, *Stock Buybacks and Corporate Cashouts* (June 11, 2018) (observing that "SEC rules do nothing to discourage executives from using buybacks" in order to "cash out at investor expense").

transactions conducted by the issuer or transactions involving treasury shares.  *See id.* § 240.16a-1(a)(2)(ii)(A) (rebuttable presumption for securities actually held by a person's family members); *id.* § 240.16a-1(a)(2)(ii)(B) (proportionate interest in portfolio securities held by a partnership); *id.* § 240.16a-1(a)(2)(ii)(C) (performance-related fees earned by brokers, dealers, and the like in certain circumstances); *id.* § 240.16a-1(a)(2)(ii)(D) (right to dividends that is separate from the underlying securities); *id.* § 240.16a-1(a)(2)(ii)(E) (interest in securities held by a trust); *id.* § 240.16a-1(a)(2)(ii)(F) (right to acquire securities through the exercise of a derivative security). Although that list is not exclusive, it is difficult to imagine Roth's theory—which depends both on treating an issuer's open-market share repurchases as purchases by an insider and on imputing a pecuniary interest in treasury stock to the corporation's shareholders—fitting comfortably within its ranks.

The history of the SEC's rules further suggests that insiders do not have a cognizable interest in repurchased shares under the agency's regulatory framework.  Prior to 1991, Rule 16a-4(c) provided that "[s]ecurities reacquired by or for the account of an issuer and held by it for its account shall be exempt from sections 16(a) and 16(b) during the time they are held by the issuer."  17 C.F.R. § 240.16a-4(c) (1990).  As the SEC explained in an interpretive release construing that provision, Rule 16a-4(c) confirmed that "[i]ssuer repurchases are exempt from the application of Sections 16(a) and 16(b)."  *Interpretive Release on Rules Applicable to Insider Reporting & Trading*, Exchange Act Release No. 34-18114, 46 Fed. Reg. 48147, 48156 (Sept. 24, 1981).  Although the SEC ultimately repealed Rule 16a-4(c) in 1991, it did so only because the provision was considered redundant in light of the fact that, by its terms, Section 16 did not apply to issuer transactions anyway.  *See Ownership Reports & Trading by Officers, Dirs. & Principal Sec. Holders*, Exchange Act Release No. 34-28869, 56 Fed. Reg. 7242, 7261 (Feb. 21, 1991)

("Since the issuer is not subject to Section 16, [Rule 16a-4(c)] is unnecessary."); *see also* Arnold S. Jacobs, *Section 16 of the Securities Exchange Act* § 2:87 (2023) (explaining that "[n]o change in the law logically could flow" from the SEC's deletion of Rule 16a-4(c)).  Rule 16a-4(c)'s broad carve-out for issuer repurchased shares and the consensus that its repeal had no effect on existing law further suggest that such repurchases cannot give rise to actionable interests.

Nor does *Feder* or the SEC's *amicus* brief in that case support Roth's position.  In *Feder*, a statutory insider of IVAX Corporation purchased IVAX shares through a limited partnership that he controlled.  220 F.3d at 30-31.  Pursuant to a shareholders' agreement, the insider also controlled a third company, NAVI, which sold IVAX shares within six months of the insider's purchases.  *Id.* at 31.  Because the insider was a controlling shareholder of NAVI, the Second Circuit held that NAVI's sales of IVAX stock could be matched to the insider's earlier purchases thereof for purposes of identifying short-swing profits under Section 16(b).  *Id.* at 34-35.  According to the Second Circuit, the insider (and the limited partnership he controlled) "had an indirect pecuniary interest in NAVI's IVAX stock because it shared indirectly in NAVI's profit through an increase in the value of their NAVI holdings," and therefore realized short-swing profits when NAVI's sales were matched to his earlier purchases of IVAX stock.  *Id.  Feder*, however, did not involve the fact pattern presented here of an *issuer*—as opposed to some other company controlled by the *insider*—allegedly having executed the matching short-swing trades.  As a result, neither the Second Circuit nor the SEC's *amicus* brief considered whether such a "control" theory would extend to treating an insider and the issuer as functionally identical for purposes of identifying matching short-swing trades.  As discussed above, the statutory text plainly treats insiders and issuers separately.  *See supra* III.B.1.  Further, the transactions that *Feder* attributed to the insider consisted of sales of NAVI's *portfolio* securities, which the SEC's rules expressly

contemplate attributing to controlling shareholders as a pecuniary interest. *See* 17 C.F.R. § 240.16a-1(a)(2)(iii) ("A shareholder shall not be deemed to have a pecuniary interest in the portfolio securities held by a corporation or similar entity in which the person owns securities if the shareholder is not a controlling shareholder of the entity and does not have or share investment control over the entity's portfolio."); *cf. id.* § 240.16a-1(a)(2)(ii)(B) (attributing to insiders their proportionate interest in portfolio securities held by a partnership). Indeed, the SEC's regulations expressly exempt "securities issued by the entity" from its definition of portfolio securities. *Id.* § 240.16a-1(g). Accordingly, *Feder* does not govern the context presented here.[10]

Contrary to Roth's view, treating an insider's sales and an issuer's open-market repurchases as pairable for Section 16(b) purposes additionally would defy the SEC's regulatory framework and practices governing insider trading. As discussed, Roth's theory relies on Rule 16a-1(a)(2) for the proposition that an issuer's shareholders have at least an indirect pecuniary interest in its open-market repurchases, and that such transactions therefore effect a change to an insider-shareholder's beneficial ownership of the issuer's securities. *See* Opposition at 12. But the SEC's regulations implementing Section 16(a)'s reporting requirement nowhere provide that insiders must report their company's open-market share repurchases as changes to their own beneficial ownership of the company's securities. *See generally* 17 C.F.R. § 240.16a-3 (detailing which insider transactions must be reported on Form 4 pursuant to Section 16(a)); *Form 4 General Instructions* 2-8 (2023), https://www.sec.gov/files/form4data.pdf (last visited Sept. 10, 2024); *see also* Motion at 24 (arguing that the SEC has never required statutory insiders who own their

---

[10] Roth's reliance on the SEC's *amicus* brief in *Feder*, *see* Opposition at 18, is similarly misplaced. As Judge Antoon observed in *Russell*, "*Feder* did not involve, and the SEC did not address in its brief, the . . . situation that this case presents," and "the SEC seems not to be operating in accordance with Roth's theory," 2023 WL 6845502, at *5—an observation that this Court shares.

company's stock to report the company's share repurchases as changes in their beneficial ownership on Form 4, despite the ubiquity of both open-market share repurchases and statutory insiders holding equity interests in their companies); Reply at 4 (same).  That the SEC has not required insider-shareholders to report any supposed interest in their company's share repurchases under Section 16(a) indicates that the agency does not view such transactions as effecting a change in beneficial ownership under Rule 16a-1(a)(2)'s pecuniary-interest standard.

The SEC's recent rulemaking regarding open-market share repurchases further belies Roth's argument, rooted in the *Feder amicus* brief and Rule 16a-1(a)(2), that the agency itself adheres to his theory.  *See Share Repurchase Disclosure Modernization*, 88 Fed. Reg. 36002 (June 1, 2023) (final rule); *Share Repurchase Disclosure Modernization*, 87 Fed. Reg. 8443 (Feb. 15, 2022) (proposed rule).  During that rulemaking, the SEC had originally proposed requiring issuers to disclose their open-market share repurchases on a new Form SR within one business day after the issuer's execution of a share repurchase order.  *See* 87 Fed. Reg. at 8446 (proposing to require "daily repurchase disclosure on a new Form SR, which would be furnished to the Commission one business day after execution of an issuer's share repurchase order").  The SEC envisioned that disclosures on the new Form SR would *supplement* the existing disclosures required by Section 16(a) and Form 4.  *See id.* at 8453 ("[T]o the extent that an issuer's purchases incorporate insiders' future outlook on the firm, they could be informative to investors (complementing the information in Form 4 filings).").  Indeed, the SEC's discussion repeatedly distinguished between trades by an *insider*, which were already required to be reported on Form 4, and share repurchases by the *issuer*, which the proposed rule sought to capture more fully precisely because existing regulations only required quarterly disclosure thereof.  *See id.* at 8453-54.

The SEC's repurchase-disclosure rule changed between its proposal and final adoption. After receiving comments criticizing the proposal on the ground that requiring daily disclosure would impose an undue burden on issuers, the SEC adopted as part of the final rule a requirement that repurchase data must be reported only on a quarterly basis, while mandating the disclosure of such data broken down by day. *See* 88 Fed. Reg. at 36014 ("[P]roviding the same detail as was proposed but on a less frequent basis would avoid many of the costs that commenters noted while still providing important disclosures that address the informational deficiencies in current reporting that we have identified."). In explaining why the agency decided against requiring daily disclosures, the SEC again distinguished between "issuer trades" like open-market share repurchases and "trades by individual insiders" that were already required to be disclosed by Section 16(a) and its implementing regulations:

> While both issuer and insider trades may reflect managers' views of an issuer's value, we recognize that the much greater frequency of issuer trades pursuant to repurchase plans relative to trades by individual insiders likely would result in considerably more frequent reporting by issuers, and thus in greater costs than those incurred by insiders reporting their transactions on Form 4. In addition, because of this greater frequency of trading, there would be a greater risk (as compared to insider transactions) that daily reporting would allow other market participants to trade strategically in response to issuer disclosures and greater potential harm to investors as a result.

*Id.* at 36015.

The SEC's attempt to overhaul the regulatory framework governing issuers' disclosures of their share-repurchase activities indicates that such transactions are generally not reportable events by insiders or subject to liability under Section 16(b).[11] If statutory insiders were already required to report their company's share repurchases as changes in their own beneficial ownership under

---

[11] The Fifth Circuit ultimately vacated the SEC's final rule under the Administrative Procedure Act. *See Chamber of Com. of U.S. v. U.S. Sec. & Exch. Comm'n*, 88 F.4th 1115, 1118 (5th Cir. 2023).

Section 16(a) and Form 4, there would have been little need for new regulations to that effect.  And in justifying why it was switching from daily reporting (as proposed initially) to quarterly reporting (as provided by the final rule), the SEC explained that because issuers trade in their own stock with "much greater frequency" than insiders do, requiring daily repurchase reporting by issuers would impose "greater costs than those incurred by insiders reporting their transactions on Form 4."  *Id.*  Of course, this would not be true if insiders with equity holdings in their companies were already required to report issuer share repurchases on Form 4, which under Section 16(a) must be filed within a similarly short period of time after the reportable transaction occurred.  *See* 15 U.S.C. § 78p(a)(2)(C) (requiring such disclosure within two business days).  Further, in declining to adopt various proposals submitted by commenters that would have "prohibit[ed] corporate insider trading before, during, and after buyback announcements and execution," 88 Fed. Reg. at 36021-22, the SEC tellingly did not refer to Section 16(b), which, under Roth's theory of liability in this case, would have accomplished a similar result by rendering insider sales within six months of their company's stock repurchases subject to liability for any short-swing profits realized.  As Judge Antoon succinctly put it in *Russell*, "[i]f the SEC viewed issuer repurchases as insider purchases for [Section 16(b)] purposes, surely it would have referred to [Section 16(b)] somewhere in its comprehensive report."  *Russell*, 2023 WL 6845502, at *5 (referring to 88 Fed. Reg. 36002).

Finally, the SEC's rules provide that the absence of a requirement for insiders to report a given transaction under Section 16(a) is fatal to a claim under Section 16(b) based on that transaction.  By operation of Rule 16a-10, "where the SEC does not require reporting under § 16(a), there can be no liability under § 16(b)."  *Citadel Holding Corp. v. Roven*, 26 F.3d 960, 965 (9th Cir. 1994) (citing 17 C.F.R. § 240.16a-10 (1989)); *see also Reliance Elec.*, 404 U.S. at 426 (observing that Rule 16a-10 excludes from Section 16(b) liability "any transaction that does

not fall within the reporting requirements of § 16(a)"); *Strom*, 641 F.3d at 1062 (same).[12]  Thus, insofar as the SEC does not require insiders to report open-market share repurchases as changes to their beneficial ownership under Section 16(a), Rule 16a-10 further undermines Roth's argument that his theory of liability is consistent with the SEC's existing regulatory framework.

### 3. Roth's Policy-Based Arguments Are Insufficient to Establish Section 16(b) Liability.

Roth concludes by insisting that the Court should adopt his interpretation under the principle that "where alternative constructions of the terms of Section 16(b) are possible, those terms are to be given the constructions that best serves the congressional purpose of curbing short-swing speculation by corporate insiders."  Opposition at 24 (quoting *Reliance Elec.*, 404 U.S. at 424).  Adopting LALFP and LALFC's construction of the statute would, in Roth's view, "undermine Section 16(b) and create manifest injustice to issuers" by giving the insider "an incentive to make use of inside information since he knows he can never be liable under Section 16(b)."  *Id.* at 24-25.  To decrease the risk of speculative abuse, Roth suggests that Section 16(b) should therefore impose liability on insiders for their companies' share repurchases unless the insider can show that they lacked the ability to "cause[] or prevent[]" the repurchases.  *Id.* at 18-19.

---

[12] While the Second Circuit held that Rule 16a-10 is invalid to the extent it purports to exempt from Section 16(b) transactions that are "[c]learly . . . comprehended within the purpose § 16(b)," *Feder v. Martin Marietta Corp.*, 406 F.2d 260, 268 (2d Cir. 1969) (internal quotation marks omitted), the Supreme Court subsequently relied on Rule 16a-10 in holding that a given transaction was outside the scope of Section 16(b), *see Reliance Elec.*, 404 U.S. at 426 (reasoning that "a 10% owner who . . . sells down to 9.96% one month and disposes of the remainder the following month[] would presumably be exempt from the reporting requirement and hence from § 16(b)").  And following the Supreme Court's decision in *Reliance Electric*, the Second Circuit reaffirmed that "§ 16(b) parallels the § 16(a) disclosure requirement."  *Lewis*, 505 F.2d at 788. Unlike the transactions at issue in *Martin Marietta*, there is no clear indication that open-market share repurchases fall within the scope of Section 16(b), so Rule 16a-10 continues to reflect the existing regulatory framework.

To Roth's credit, the Second Circuit has stated that "Section 16(b) should be applied without further inquiry if there is 'at least the possibility' of speculative abuse of inside information." *Huppe v. WPCS Int'l Inc.*, 670 F.3d 214, 219 (2d Cir. 2012) (quoting *Blau v. Lamb*, 363 F.2d 507, 519 (2d Cir. 1966)). The Second Circuit has also "made clear, however, [that] even if a transaction is found to present the opportunity for speculative abuse, there can be no liability under Section 16(b) unless the statutory requirements are also met." *Gwozdzinsky*, 156 F.3d at 310 ("[I]f speculative abuse alone were enough to invoke liability, then the more conventional purchases and sales that take place within six months and a day would result in liability, which plainly they do not."). For the reasons explained above, the Court holds that the statutory requirements of Section 16(b) have not been met in this case, and therefore the mere possibility of speculative abuse, assuming it exists, is not sufficient to trigger liability here. But even considering Roth's policy arguments on their merits, they hardly support his position.

For instance, Roth's interpretation of Section 16(b) would drastically expand the operation of the statute—a statute that again, as the Second Circuit and the Supreme Court have instructed, must be applied "narrowly," *Foremost-McKesson*, 423 U.S. at 251; *Packer*, 981 F.3d at 154, and carefully confined to its "limited areas of clear and unambiguous liability," *Lewis*, 505 F.2d at 787. Under Roth's theory, "every time a company that issues an equity security conducts a sale or purchase in that security, every insider in that company is deemed to conduct the transaction himself under [Section 16(b)]." *Russell*, 2023 WL 6845502, at *4.[13] Consequently, "Roth's

---

[13] Roth tries to avoid many of the negative consequences that his theory would entail by suggesting that repurchase liability could be limited to controlling shareholders, or at least to insiders who have the ability to cause or prevent share repurchases. *See, e.g.*, Opposition at 18-19. But the definition of "pecuniary interest" he relies on is not limited to controlling shareholders, nor is the list of statutory insiders who are subject to reporting requirements and potential liability under Sections 16(a) and 16(b). As Judge Antoon correctly observed in *Russell*, adopting Roth's

theory of liability would cause every insider who sold stock in the months before a corporate repurchase to become retroactively liable under the statute." *Id.* (alteration adopted and internal quotation marks omitted) (observing that "under Roth's theory, insiders who sold their company's stock for themselves less than six months before the company repurchased its own stock would be strictly liable for any profits they made from the pair of transactions, unless an exception applied"). This theory could therefore give rise to the exact type of scenario that the SEC, through its implementing regulations, has elsewhere attempted to avoid. *See Chechele*, 758 F.3d at 470-71 (observing that the SEC's regulatory framework aims "to avoid the unfairness of subjecting insiders to liability under Section 16(b) who engage in a purchase or sale and then have an offsetting sale or purchase thrust upon them thereafter by events not known in advance and outside their control" (alteration adopted and internal quotation marks omitted)).

Expanding the statute in this manner could impose considerable burdens on corporate insiders even beyond the expansion of direct liability. Construing Section 16(b) as reaching an issuer's open-market share repurchases would imply that insiders must also now report their interest in such transactions under Section 16(a) within two business days of each transaction. *See* 15 U.S.C. § 78p(a)(2)(C) (requiring insiders to report changes to their beneficial ownership of the issuer's securities within two business days); 17 C.F.R. § 240.16a-3(g)(1) ("A Form 4 must be filed to report . . . [a]ll transactions not exempt from section 16(b) . . . ."). Yet as the SEC observed in switching from a daily reporting requirement in its proposed repurchase-disclosure rule to quarterly reporting in the final rule, given the "much greater frequency of issuer trades pursuant to repurchase plans" requiring daily reporting would impose excessive compliance costs on issuers.

---

theory could therefore have consequences well beyond the controlling-shareholder context. *See Russell*, 2023 WL 6845502, at *4.

88 Fed. Reg. at 36015.  The impact of these reporting costs, of course, would be felt even more severely by individual insiders, who under Roth's theory would be required to report every change in their beneficial ownership caused by an open-market share repurchase within two business days pursuant to Section 16(a).  Further, in the context of its disclosure rulemaking, the SEC recognized that restrictions on insiders' ability to sell shares close in time to open-market share repurchases "could limit the ability of corporate insiders to purchase or sell securities at issuers that conduct repurchases periodically over an extended period of times" and thereby "significantly decrease the liquidity of insiders' holdings of an issuer's securities, including securities obtained from equity-based executive compensation."  87 Fed. Reg. at 8459.  Even if Roth's theory could be cabined to just controlling shareholders, as opposed to insiders more broadly, many these problems would remain.

Lastly, Roth's cause-or-prevent test is inconsistent with Congress's purpose in enacting the statute.  As the Second Circuit has held, Section 16(b) creates "rules that can be mechanically applied," *Gibbons*, 703 F.3d at 603 (emphasis omitted), not seemingly amorphous standards like the cause-or-prevent test that Roth's theory would entail.  Requiring a judicial inquisition into whether a particular statutory insider, by virtue of his role or other circumstances, crossed some undefined threshold of ability to cause or prevent his company's share repurchases would flout Congress's intent in having Section 16(b) operate as "a relatively arbitrary rule capable of easy administration" and instead create serious difficulties for insiders in complying with Section 16(a)'s disclosure requirements.  *Reliance Elec.*, 404 U.S. at 422; *see also Tristar*, 84 F.3d at 553 (explaining that under Section 16(b), shareholders should be able to "determine easily and quickly whether any statutory insider has profited from a short-swing transaction" and noting that "recovery in such actions is virtually automatic" (internal quotation marks omitted)).  A

jurisprudence that inquires into causation or prevention on an insider-by-insider basis would "run[] contrary to this fundamental statutory purpose." *Gibbons*, 703 F.3d at 603; *see also At Home*, 446 F.3d at 409 (noting "Congress's intent that the statute be simple and arbitrary in its application" (internal quotation marks omitted)).  Instead, "the better interpretation of § 16(b) is that the statute simply does not apply to these nonpairable transactions." *Gibbons*, 703 F.3d at 604.

*   *   *

The role that open-market share repurchases play in American corporate life has become a subject of "increasing public skepticism" over the past several years. *Chamber of Com. of U.S. v. U.S. Sec. & Exch. Comm'n*, 85 F.4th 760, 766 (5th Cir. 2023).  But at the end of the day, whether and to what extent the current statutory framework should be expanded to address open-market share repurchases presents fundamental questions of public policy that are not for this Court to resolve.  Absent a clearer indication from Congress in the text of Section 16(b), the Court declines to take that step itself.

### IV.  Conclusion

For these reasons, LALFP and LALFC's motion to dismiss is granted.  And because the deficiency in Roth's complaint implicates the core of his legal theory, that dismissal is with prejudice.  *See Olagues v. Icahn*, No. 15 Civ. 898 (GHW), 2016 WL 1178777, at *15 (S.D.N.Y. Mar. 23, 2016) (dismissing a Section 16(b) claim without leave to amend where "any attempt to replead the claims on the theoretical basis asserted by Plaintiff would be futile" (citing *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997))).  The Clerk of Court is respectfully directed to terminate the motions pending at Docket Numbers 19 and 23, enter

judgment in favor of Defendants LALFP and LALFC and Nominal Defendant Estée Lauder, and

close this case.

     SO ORDERED.

Dated: September 10, 2024
      New York, New York

                                   JOHN P. CRONAN
                            United States District Judge